Good morning. I we have a very full docket today. I know that I have not had the pleasure of seeing many of you before me yet. I'm getting that better.  You do not have to wear their mask. They choose not to win at the podium. It's entirely up to you. Mr Adams. Are you? Good morning, Your Honors. My name is Derek Adams. I represent the plaintiffs appellants in this matter. May it please the court. If I may start with the issue of mootness. That's an issue that both sides have spent quite a bit of time briefing, especially at the Second Circuit. The question on mootness is, can this court still issue an injunction that would provide effective relief to the plaintiffs appellants in this matter? And the answer to that is a resounding yes. This issue of mootness was first raised down at the district court. But isn't the money now in the hands of the MCOs? You are correct, Your Honor. The money is in the hands of the MCOs. Down at the district court. And they're not a party. They are not a party, Your Honor, but they are under the control of the state. They are Department of Health's agent. They are effectively at their direction in executing the Medicaid program. I understand that some of the money has already been distributed as well by the MCOs to the agencies. So, Your Honor, we have been informed that the MCOs had until the first week of May to distribute the $361 million to the LICSs, to the winning LICSs. We don't know how much of that $361 million has been distributed. Neither the state nor the federal defendants have said that all of it has been distributed. So we believe that there is still money on the table that is ripe for an injunctive relief that could be issued by this court. So are we partial mootness? Not total mootness? No, we're not. We don't think there's mootness at all, Your Honor. It's similar to the decision that then-Circuit Court Judge Sotomayor issued the opinion for the court in Moore v. Consolidated Edison Company of New York. And essentially the question there was the original injunctive relief that was requested may look different than it did six weeks ago. But the court is ultimately determining this is an equitable remedy. Is there an equitable injunction that can be issued that provides effective relief, even if that's partial effective relief, to the parties? We know that there's $361 million that's being distributed by the MCOs. And we know that some of that $361 million has not been distributed yet and would be subject to this court's injunction against DOH ordering them to instruct the MCOs to hold the money until this legal issue has been decided. And for the last six weeks, DOH has been saying, well, once the money goes to the MCOs, this issue's moot. We can't touch it. And last night at 1021 p.m., they sent you a letter, Your Honors, saying, actually, we wanted to alert you that we, DOH, are planning to instruct the MCOs to hold on to the money. It's not the instruction we want, but it shows that the MCOs are clearly within the control of the Department of Health. The reason they're in the control of the Department of Health is because of the way managed care works. Department of Health is the single state agency designated by federal statute, by federal regulation. And they are responsible. They are responsible for administering the Medicaid program. The fact that they do that through subcontractors like the MCOs does not mean that they do not have control over the parties that they are responsible for. There's contractual language that they're submitting to the MCOs and working with them that direct these payments to the specific providers. After the money was distributed, they went to the MCOs and said, and to the providers, and said, we want providers to sign agreeing that this money's being distributed under the MCOs' obligations to the Department of Health. So for all those reasons, and we cited- Can you speak to the likelihood of success? Yes, Your Honor. Likelihood of success is an important issue here. Likelihood of success, you know, in the district court, Judge Cronin determined that we had not met our burden of establishing a likelihood of success on the merits. He found that we had met irreparable harm, which is the touchstone of a preliminary injunction and TRO. And so the issue that held him up was on the likelihood of success on the merits. The question is, is this payment that the state is making to the MCOs, is it actuarially sound? Now, both sides agree that the Medicaid statute requires that a payment from the state to the MCOs must be actuarially sound. Does this mean that you're conceding reasonableness? No, absolutely not, Your Honor. So the starting principle is it has to be actuarially sound. They agree, we agree, Medicaid statute, CMS, Director Giles testified- And you agree that you have that burden, is that right, to prove that it's not actuarially sound? So we have to show a likelihood that it's not actuarially sound. Okay. The regulation- Did you present anybody? Did you present an actuary that said it was not actuarially sound? We did not present expert testimony. But as the Supreme Court has recognized, at the stage of a preliminary injunction, often the evidence that's developed is obviously not at trial because of the urgency of a preliminary injunction. And regularly, injunctions are issued without expert testimony. The testimony of the Medicaid director at the district court and CMS's director, in our view, along with the documented evidence of the actual preprint that was set up here, establishes that it was not actuarially sound. Certainly that we have a likelihood of being successful at trial on the merits that it was not actuarially sound. The reason for that is because the whole principle of actuarially soundness is tying it to the cost to the Medicaid beneficiary. You look at what does it cost to serve these Medicaid beneficiaries, and the rate has to be consistent with the cost of coverage. In this case, DOH did something that turns that on its head. Instead of looking at cost, they looked at the revenue of the providers, and they said, we're going to determine this class based solely on revenue. Who's the biggest? And that's who ends up getting the money. And the money- But they are going to- I mean, is that entirely fair, right? They are going to assess it on an annual basis, right, to make sure that their presumption that they came up with a reasonable plan with a reasonable goal has been tested, right? Your Honor, at that point, it's too late, frankly. The money already goes out. The $361 million goes out, and it's not too late just because we say it. The Medicaid statute says it's too late. They cannot make this payment unless it's actuarially sound. The fact that CMS waits- Well, maybe you can help me with this. Because part of the problem I'm suffering from is that the statute clearly contemplates more than one right answer, right? It uses language like actuarially sound. It uses language like reasonable. And you seem to be suggesting that there's only one way that this could have been done, which I don't think comports well with languages like actuarially sound and reasonable. So if you could kind of help me through that, I'd appreciate it. Absolutely, Your Honor. So there's not an either or here. The starting principle is it needs to be actuarially sound. The Medicaid statute requires that. The regulation at issue 42 CFR 438.6 requires that. That was one of the key issues Judge Cronin got wrong. He said, well, you're focused on the issues of actuarially soundness, none of the issues under 438.6. 438.6 specifically provides that all contract arrangements directing the MCOs must be developed in accordance with 438.4, the standards specified in 438.5, and generally accepted actuarially principles and practices. 438.4 is the standard for actuarial soundness. That is the regulation CMS puts out and says, this is how you do it. And they tie it to the cost of the beneficiary. So if you set up something that has no relationship to a differentiation in cost, and to explain what they've done here, they basically have acknowledged this in testimony. The Medicaid director says when they normally set the rates, they don't draw distinctions between the LICSs. There's four regions in New York. In each region, they consider the LICSs to have the same cost structure. So there's no differentiation in the cost to provide services. That's the baseline. What they've done here is they've taken that structure and they've broken it out and said, even though these providers have the exact same cost structure as these providers, we're going to treat it as if these providers get a higher rate than these providers. That's why it's actuarially unsound. And it has to be actuarially sound to get past 438.6, to be a directed payment that goes to the state. If it's not, and as CMS has talked about at length, that becomes effectively a pass-through payment. It's a side deal that goes to the providers rather than follows the basic principles of managed care, which is an actuarially sound payment that goes to the MCOs. But you didn't answer Judge Perez's question about annual review. So this is a one-year distribution. Next year it might be different. Well, what we're here on the injunction, Your Honor, is the 361 million payment. They are not committed under federal law to make that payment, full stop, unless it's actuarially sound. They don't get to fix it later on. They don't get to determine six months later. They spoke to Deloitte, didn't they? Deloitte, yeah. So Deloitte, that's an area where Judge Cronin respectfully got it wrong on the testimony. Deloitte did not consider whether this was actuarially sound. Medicaid Director Freeman referenced Deloitte as potentially being somehow consulted. They have never put forth evidence that they had any actuary determine that this was actuarially sound. And Judge Cronin said that there was a, quote, expert actuary in the record that had approved the proposal. That was wrong. There's not an expert actuary in the record that's approved the proposal. They went to Deloitte for actuarial advice. Isn't that what they did for them here? So Deloitte is the one that does the year-end analysis for the Department of Health. Just like the Office of the Actuary at CMS does the year-end analysis. But we're not there yet. They haven't done the analysis. We're before that, and we're at the place where they're making a payment which is actuarially unsound. They don't get to wait six months from now to have somebody else determine, oh, in fact, it's not actuarially sound. Because the question is, is the payment that goes out, does it go out? Is it actuarially sound? So you mentioned before that they just took the largest LHCSAs. But, in fact, one-third of the largest entities serve 92% of all the Medicaid recipients in the state. That seems to me not actuarially sound, but policy-wise sound. Doesn't it to you? Well, Your Honor, respectfully, the question of policy, you don't even get to that until you determine something is actuarially sound. I would say no, because as a policy matter, what the state's done is it's taken the smaller LHCSAs that provide more diverse care to socially disadvantaged populations within the state, and it is putting them out of business. It's giving the large players a chunk of money that they can use to directly recruit our employees and take our employees and our patients away from us. So they're putting people out of business that are providing excellent services. From a policy standpoint, we do not agree that this is a good policy decision. The fact that we are the bottom two-thirds of LHCSAs provide 8%, that's still a significant amount of services. Our clients were set to receive over a million dollars in some of our clients on this first distribution. It's not insignificant. The amount of services they provide is not insignificant. The state argues that by giving more money to the LHCSAs, they allow better services to the 92% of the state population that they serve. Yes, this was testimony that came out in the district court where Director Friedman essentially said, I think the bigger LHCSAs provide better quality. And I asked him, what is your basis for that? And he said, well, generally when you do more of something, you're better at it. We don't agree with that. Our LHCSAs provide amazing quality. They often develop because the larger players can't serve a specific population of beneficiaries. And those beneficiaries need specific language, specific cultural sensitivity. That's often why the smaller players form up in communities. So we think we provide better quality, certainly not worse quality than the large LHCSAs. Thank you. Okay, thank you so much. Thank you, Your Honors. Good morning, and may it please the Court. Blair Greenwald on behalf of the state. I'd just like to correct a few things about what was just said regarding the state's rationale, but then turn to the mootness and necessary parties issue. First of all, the aim was not to benefit just large LHCSAs and drive little ones out of business. Instead, the purpose of these funds at the LHCSAs with the largest reach in each of four regions of the state was to maximize the value of the funds for large-scale projects to improve the home care sector. So this money isn't going just to provide services. Rather, it's going to large projects like workforce training and recruitment programs and improvements. So that speaks to reasonableness, right? Yes, Your Honor. Can you talk about the actuarial soundness part of the action, please? Sure. And I think the simplest way to dispose of that issue is that the actuarial soundness regulations govern the soundness of the standard monthly payments from the Department of Health to the MCOs. And they do not govern or apply to this one-time payment from the MCOs to the providers. Now, the appellants here are focusing on the second exchange, which is not at issue in the regulations here. And they focus on the cost to LHCSAs when the regulation talks about the cost to the MCOs. So that regulation just does not apply to the payment here. But in addition, as the court noted— No, I'm sorry. So your position is that your policy does not have to be actuarially sound? To the extent that it is later incorporated into the rate certifications that DOH provides to CMS, CMS will determine whether the overall rates are actuarially sound. But what is at issue here is appellants' arguments that they have somehow proved actuarial soundness because of issues about cost to the LHCSAs. And the cost to the LHCSAs are not what is at issue in the regulation. So appellants have not shown, and it is their burden to show, that this payment renders the rates to the MCOs actuarially unsound. Right. But I think I just want to make sure that we're clear on this. There's a distinction between having to pre-certify that you are and you actually having to be. Right? And your last argument kind of muddled them a little bit for me. Is it the state's position that you do not need to provide an actuarially sound policy? We need to provide actuarially sound rates to the MCOs. The payment at issue here is not what the regulation specifically applies to in terms of making that actuarially soundness dependent on cost. Because actuarial soundness is dependent on cost to the MCOs. Appellants argue here that it is not actuarially sound because of issues with cost to the providers. In other words, their argument doesn't align with what the regulation requires. Therefore, they haven't shown that the rates could be actuarially unsound. But have you shown that on the first level to the payment to the MCOs that it is actuarially sound? We have consistently done that. We have consistently done that every year. And as appellants noted, the state has been consulting with Deloitte in conjunction with this directed payment plan to make sure that when the final rates are calculated for the overall rates to the MCOs that those are actuarially sound versus what appellants have failed to show. You argue you've met the test of actuarial soundness and the distribution to the MCOs, correct? We think that is true. But more importantly, appellants have not presented any evidence that that is not true. In addition, I would just like to turn briefly to the mootness arguments and the equities factors. First of all, the court does not have before it here the proper parties to issue the real relief that appellants want now, which is to freeze the funds that are held by the MCOs. And Your Honor is correct that some of these funds actually are already out to the providers as well. But in addition, the relief that appellants sought in the district court, which was to freeze the funds in the hands of the state, that is moot. And now that they've changed their request to try to freeze the funds in the hands of the MCOs, but they didn't accordingly join the MCOs in order to properly obtain that relief. We kept you a bit longer, and you do have a colleague. So if you could get to the end of your thought quickly, I'd appreciate it. Sure. Just that the MCOs are necessary parties here under the Federal Rules of Civil Procedure because they have independent interests here that they need to be able to be here in order to sufficiently protect, including holding the money regardless of their contractual obligations with the providers and potentially standing to lose their portion of the payment for administrative work that they performed to distribute the funds. Thank you. Thank you. Thank you. Counselor, if you could clarify something that has come up as to whether or not Deloitte was consulted in the first instance of developing this policy, as opposed to it's only going to look at it at the back end. Sure. So the testimony, and I actually brought the excerpt from the transcript up with me, and this was from Brett Friedman, who is the state Medicaid director. He said on page 80, we use Deloitte as our contracted independent actuary, and they're involved from the inception. Let me take this off. They're involved from the inception of a directed payment preprint. And then he goes on to say it's because they do the annual rate certification, and then, and this is a quote, so when we do issue those annual certifications, they will certify the actuarial accounting. Now, I think part of the confusion between the initial directed payment approval and the full actuarial soundness review relates to the scope of that review. So as this court is aware, there is under the regulations an initial review, and that looks at six specific requirements, none of which expressly reference actuarial soundness, although there is also a requirement separately that the directed payment be developed in accordance with principles of actuarial soundness. Those are complex principles. They need to be evaluated by an actuary, and the way that works is the capitation rates as a whole, once the approved directed payment is incorporated into those rates as a cost, are evaluated by the Office of the Actuary at CMS. I would note the government, the federal government, supports the distribution that New York State DOH made to the MCOs. Is that correct? You're sitting on that side of the podium. Yes, Your Honor. Plaintiffs have challenged the federal government's approval of this directed payment and claimed that it's arbitrary and capricious and contrary to law, and it was not, and that's our position. Now, obviously, plaintiffs take issue with this distribution, and that's essentially for policy reasons. Appellants today talked about how they don't agree that this is a good decision, and that's obvious, but what they have failed to do is identify any principle of actuarial soundness that has actually been violated here. Not only have they not put in evidence from an actuary or otherwise that this is not actuarially sound, but they haven't even explained under their own theory why that would be so in any reasonable way. So actuarial soundness, as I said, is a complicated concept, but the key, and this is evident from the regulations including 42 CFR 438.4, which defines actuarially sound capitation rates, the key is that rates are tied to costs under the contract. So they have to provide for reasonable, appropriate, and attainable costs required under the terms of the contract for the operation of the managed care organization for the time period and population covered under the terms of the contract. Now, here, recall, as part of this directed payment, LTSAs will incur additional obligations. In other words, they're going to incur additional costs, which will then be covered by additional funding. There's no actuarial soundness problem with that on a fundamental level, and nothing that plaintiffs have cited suggests otherwise. In fact, the Office of the Actuary at CMS is involved in the directed payment approval, and it's not a full actuarial soundness review, but they're able to flag any issues at that preliminary stage that might impact the subsequent review. Plaintiffs don't point to any requirement relating to actuarial soundness or otherwise, suggesting that every LTSA in the state needs to be directed to incur the same costs and receive additional funding. And by the way, also, there's testimony from plaintiffs' own witnesses in the record that the LTSAs already receive different amounts of funding from the managed care organizations, because what we're talking about here is capitation rates to the managed care organizations from the state. Thank you so much. We appreciate it. Thank you.